# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Matthew J. Hayduk, Appellant,

v.

Emily Rudisill Hayduk, Respondent.

Appellate Case No. 2018-001833

———————————

Appeal from Greenville County
Tarita A. Dunbar, Family Court Judge

———————————

Opinion No. 5889
Heard June 16, 2021 – Filed January 12, 2022
Withdrawn, Substituted, and Refiled May 4, 2022

———————————

## AFFIRMED

———————————

David Alan Wilson, of Wilson & Englebardt, LLC, of
Greenville, for Appellant.

J. Falkner Wilkes, of Greenville, for Respondent.

———————————

**LOCKEMY, A.J.:** Matthew Hayduk (Husband) appeals the family court's order
dismissing his action for divorce based on his failure to meet the residency
requirements of section 20-3-30 of the South Carolina Code (2014) and awarding
attorney's fees to Emily Hayduk (Wife). We affirm.

## FACTS

Husband and Wife married in Maine on June 25, 2011. They had two children:
Child 1, born in August 2011 and Child 2, born in October 2014 (collectively,

Children).  On June 23, 2017, Husband filed a complaint for divorce on grounds of adultery and sought separate support and maintenance, child support, child custody, and visitation.  He alleged he and Wife separated on September 10, 2016.  In addition, Husband asserted he was a resident of Greenville County, South Carolina.[1]

After Wife failed to answer, Husband filed an affidavit of default on August 2, 2017.  On August 7, 2017, Wife moved to dismiss Husband's complaint for lack of personal jurisdiction.  Wife argued Husband failed to meet the residency requirements of section 20-3-30 and the court lacked jurisdiction of the issues pertaining to Children under section 63-15-330 of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA).[2]  The family court held a hearing on April 3, 2018, and April 13, 2018, to address these jurisdictional issues.  At the outset, Wife conceded Husband served her in South Carolina.

From the time the couple married in June 2011 until early 2014, they lived with Wife's parents—the Rudisills—in Eden, North Carolina.  For a short period from early to late 2014, Wife, Husband, and Child 1 lived in a home on East Meadow Road in Eden; Wife's friend had inherited the home and allowed them to live there rent-free provided they paid the taxes and maintained the property.  However, Wife and Husband had to move out sooner than expected when the homeowner decided to rent to a paying tenant instead.  At that point, they moved back in with the Rudisills.

Wife explained that in 2011, while she was pregnant with Child 1, she and Husband began looking at homes in Eden and planned to purchase one.  Wife stated she and Husband found a home on Center Church Road in Eden and made an arrangement with the homeowner that if they paid the back taxes, the home would belong to them.  She stated they obtained an ownership interest in the home when they paid the back taxes in cash at the Rockingham County Courthouse in 2011 and the owner of record allowed them to renovate and live in the property; however, Wife acknowledged this interest was not recorded.  Wife explained the home needed renovation to make it "livable," and the renovation process took longer than expected.

---

[1] Wife filed a separate action in North Carolina on July 7, 2017, seeking emergency ex parte custody of Children.
[2] *See generally* S.C. Code Ann. §§ 63-15-300 to -394 (2010).  Section 63-15-330 sets forth the circumstances under which a South Carolina family court has jurisdiction in a child custody proceeding.

Child 2 was born in October 2014. Wife explained that in December of 2014, she, Husband and Children traveled to South Carolina to visit Husband's parents at their home on Ansley Court in Greer and they stayed there until the spring of 2015. They then returned to Eden and moved into the home on Center Church Road. Wife explained that although the home needed more work, enough had been done to make the home habitable. She testified they moved all of their belongings and furniture into the house on Center Church Road, the four of them stayed there regularly, and Husband kept all of his vehicles there.

Wife testified Husband's mother eventually came to own the home and deeded the home to Wife on October 5, 2015. Wife acknowledged, however, that there was no recorded deed showing this. Wife stated that when they originally acquired the Center Church Road home, her understanding was that she, Husband, and Child 1 would live there "for a couple [of] years, flip and sell [it] and move closer to Greensboro." Wife explained Greensboro was about a forty-five-minute drive from Eden. She stated she and Husband "had always talked about wanting to be closer to Greensboro" because it was a larger city, was where Children went to school, and where Husband would have to fly out of for his work with Delta.

Wife testified she enrolled Child 1 in preschool in Eden for the 2015–2016 school year. During the summer of 2016, Wife went to training in Charlotte for a Montessori teaching position and continued to live at the Center Church Road home. Wife began teaching at the Greensboro Montessori School in the fall of 2016 and Children were both enrolled there. Wife testified she and Husband separated in September 2016 and she moved all of her things out of the home and moved back to the Rudisills' with Children. She stated all of Husband's belongings were still in the home after she moved out and that Husband's visitation with Children always occurred at the home on Center Church Road. She averred Husband gave her no indication that his home was actually not with Wife but with his parents in South Carolina.

Wife testified that through 2016, she and Husband were heavily involved in Rockingham County politics. She stated Husband encouraged her to run for the Rockingham County School Board in 2014. Wife testified Husband was on a committee for the Rockingham County Republican Party and accompanied her to all of the Republican Party events in Rockingham County. She stated he donated to the campaigns of several North Carolina politicians and was "extremely involved in Rockingham County and North Carolina politics."

Regarding Wife's tax returns, she testified Husband controlled their financial life and she was "not privy to any kind of tax returns, other than the ones that he filed for [her] when [she] was working in Eden." She stated those were North Carolina tax returns. Wife acknowledged she signed a South Carolina tax return for Children after she and Husband separated, but she stated he told her to sign it and she felt she had no choice but to do so.

Rinda Rudisill, Wife's mother, testified that from June 2011 until 2014 Wife, Husband, and Child 1 lived at the Rudisills' home in Eden, North Carolina. Rudisill testified that in December of 2014, Wife, Husband, and Children left to visit his parents in South Carolina for Christmas. According to Rudisill, they extended their stay in Greer because Husband "got mad at" Wife's father and they did not return until about June of 2015. She testified that when they left, they took only suitcases with what they would need for the trip and nothing indicated they were leaving for a long time. Rudisill stated Wife's father replaced the wiring and plumbing in the Center Church Road home and Wife, Husband, and Children moved into the home when they returned to Eden. Rudisill averred Wife and Husband's long-term plan was to stay at that home. Rudisill testified Husband never gave her the impression he considered the Center Church Road home to be his second home. She recalled Wife, Husband, and Children lived at the home until September 2016 when Wife and Children moved back with the Rudisills.

Additionally, Mary Tabor, a friend of Husband and Wife, testified she met Husband and Wife in Eden in 2014 and that Husband regularly attended political events in Rockingham County in Eden. Tabor recalled that when she visited the Center Church Road home in May 2016 and in the fall of 2016, Husband was present and appeared to be living there.

Husband testified his "flag was planted" in Greenville, South Carolina in 2011 and had never moved from there. Husband testified that he had always considered his parent's home on Ansley Court in Greer, South Carolina, to be his permanent residence. He stated he and Wife intended to "end up back in Greenville" until they found a place to put their "flagpole." Husband noted Wife's military ID card and DEERS enrollment listed the Ansley Court home as her address. He stated the last time he, Wife, and Children were together in South Carolina was in August 2015 for a family vacation in Edisto.

Husband testified he had worked as an airline pilot for Endeavor Air, a Delta Airlines subsidiary, since November 2015. Husband explained his crew was based in LaGuardia in New York City and he commuted by traveling from the airport of

his choosing. Husband testified he was also a commissioned officer in the United States Army Corps of Engineers. He stated he joined the Army in September 1999 and never had a break in service but, at times, he was on inactive reserve status. Husband was on inactive reserve status at the time of the hearing, and his unit assignment was in Pennsylvania. Husband testified that during his marriage, he had two long tour assignments and several shorter tours of forty-five days or less. From June of 2012 to August of 2013, Husband was stationed in Enid, Oklahoma, and from May of 2016 until November of 2016, he was stationed in Harrisburg, Pennsylvania. Prior to leaving for training in Oklahoma, Husband was staying with Wife at the Rudisills' home in Eden. Husband stated that after completing training in Oklahoma, he "bounced back and forth" between the Rudisills' and his home unit in Pittsburgh. Husband stated he was fully released from active duty in December of 2013, at which point he returned to Eden with Wife and Child 1, and began looking for work. He explained he took security assignments and instructor positions during that time.

In June or July of 2015, Husband was notified that he was to be placed on active military duty and deployed to the Republic of Kosovo in January of 2016; however, the deployment never took place. In August 2015, Husband accepted a job with Delta and received orders from the U.S. Army National Guard unit in Pennsylvania. He stated he spent some days of the week flying for Delta and some days working for the Army. Husband testified that during this time, Wife and Children lived with the Rudisills in Eden. Husband agreed he supported Wife when she ran for the school board, and he admitted he contributed funds to the campaign of a North Carolina congressional representative.

When asked whether he lived at the Center Church Road home, Husband stated he never disputed he "laid his head there." He testified his mother purchased the Center Church road home in 2012 or 2013 because the investment required to pay the back taxes on the home was more than he had available. He stated his mother still owned the home and he still had personal items there. However, he denied owning an interest in the property.

The family court admitted a copy of two Rockingham County voter profiles in Husband's name. The first document reflected a "register date" of March 12, 2012, and showed the East Meadow Road address in Eden, North Carolina; the second reflected a register date of October 12, 2016, and listed the Center Church Road address in Eden, North Carolina as his home. This voting record showed Husband voted in the primaries and general elections in 2012 and 2014 and in the general election in 2016 in Eden, North Carolina. Husband stated he did not recall voting

in the 2012 and 2016 general elections in Eden. A copy of a "request to cancel voter registration" was included with the exhibit, and the reason selected on the form was "I no longer live in North Carolina." This request showed a filing date of May 8, 2017.

The family court issued an order dismissing the complaint, finding Husband failed to show he resided in South Carolina for at least one year prior to filing the divorce action. The family court characterized the issue as a question of personal jurisdiction in its order and concluded it "d[id] not have jurisdiction over the parties in this action" pursuant to section 20-3-30. The family court noted, "Husband was argumentative during cross-examination, which caused the [c]ourt to doubt [his] credibility," and "evasive" when answering questions about the home on Center Church Road and the date of the parties' separation. The family court further opined that although Husband seemed able to recall "intricate details of his life and employment," when questioned about his voting record, he could not recall. The family court found "the testimony and evidence presented by Wife indicate[d] both parties intended for North Carolina to be their marital home" and found "Wife's testimony more credible than Husband's in regard to intent of domicile." The court found Husband "intended to come back home and lay his head down with his wife and children, not his parents, when he was not deployed." In addition, the family court concluded Husband's voting records provided "clear evidence" that he considered North Carolina his domicile until May 2017. The family court determined Wife was entitled to attorney's fees and costs in the requested amount of $7,241.04. Finally, the family court concluded it lacked jurisdiction over the minor children under the UCCJEA.

Husband moved to reconsider, arguing the family court erred by finding it lacked jurisdiction over the divorce and by awarding attorney's fees to Wife. He argued the family court erred by placing significant emphasis on his purported North Carolina voting record and ignored exhibits showing the parties intended South Carolina to be their home. Husband argued Wife failed to produce a financial declaration and the family court could not properly assess her financial condition or the other required factors for an award of attorney's fees.

The family court denied the motion, clarifying it had "considered all of the evidence and put more weight on the evidence presented by [Wife] and . . . the testimony of her witnesses[, s]pecifically, [Wife's] evidence regarding [Husband's] public North Carolina voting record." The court noted the record showed Husband voted in North Carolina until November 2016 and found that under North Carolina

law, a voter must be domiciled in the specific North Carolina precinct where he is registered.  This appeal followed.[3]

## ISSUES ON APPEAL

1. Did the family court err by finding Husband failed to satisfy the residency requirement of section 20-3-30?

2. Did the family court err by awarding Wife attorney's fees and costs?

## STANDARD OF REVIEW

This court reviews family court matters de novo.  *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011); *Stoney v. Stoney*, 422 S.C. 593, 594, 813 S.E.2d 486, 486 (2018).  Notwithstanding this broad scope of review, we recognize the family court is "in a superior position to assess the demeanor and credibility of witnesses." *Lewis*, 392 S.C. at 390, 709 S.E.2d at 654.  Further, the appellant maintains the burden of showing "that the preponderance of the evidence is against the finding of the [family] court." *Id.* at 388, 709 S.E.2d at 653.

## LAW/ANALYSIS

### I.  Jurisdiction

Husband first contends Wife couched her motion only as a motion to dismiss under Rule 12(b)(2), SCRCP, for lack of personal jurisdiction and the inquiry should have ended when the family court determined it had personal jurisdiction.  He asserts the issue of residency implicated *in rem* or subject matter jurisdiction and Wife did not contest that issue specifically.  Husband argues the preponderance of the evidence did not support the family court's finding that he had not resided in South Carolina for at least one year prior to filing the divorce action.  He contends the family court relied heavily on his North Carolina voting record and erred by finding he could not maintain his domicile in South Carolina if he voted in North Carolina.[4]  We disagree.

---

[3] Husband did not appeal the family court's determination that it did not have jurisdiction over the minor children under the UCCJEA.

[4] Although Husband referenced the Servicemembers Civil Relief Act, 50 U.S.C. § 3901–4043, in his reply brief, we find this issue is unpreserved for our review because he failed to raise this argument to the family court.  *See Elam v.*

"Before the family court can exercise subject matter jurisdiction over a marriage and grant a divorce, the plaintiff or defendant must have been a domiciliary of South Carolina." *Roesler v. Roesler*, 396 S.C. 100, 106, 719 S.E.2d 275, 279 (Ct. App. 2011).

> In order to institute an action for divorce from the bonds of matrimony the plaintiff *must have resided in this State at least one year prior to the commencement of the action* or, if the plaintiff is a nonresident, the defendant must have so resided in this State for this period; provided, that when both parties are residents of the State when the action is commenced, the plaintiff must have resided in this State only three months prior to commencement of the action.

§ 20-3-30 (emphasis added); *cf.* Roy T. Stuckey, *Marital Litigation in South Carolina* § 1.C. (5th ed. 2020) (interpreting the residency requirement of section 20-3-30 as an issue of in rem jurisdiction); *id.* ("In rem jurisdiction refers to the court's power over the subject of the litigation, for example, the marriage . . . . The family court acquires jurisdiction over the marriage, and the power to grant a divorce, when one or both parties meet the statutory requirements to become residents of South Carolina."). "The term 'reside' as used in the foregoing statute is equivalent in substance to 'domicile.'" *Gasque v. Gasque*, 246 S.C. 423, 426, 143 S.E.2d 811, 812 (1965). "Domicile 'means the place where a person has his true, fixed[,] and permanent home and principal establishment, to which he has, whenever he is absent, an intention of returning.' The true basis and foundation of domicile is the intention, the *quo animo*, of residence." *Roesler*, 396 S.C. at 107, 719 S.E.2d at 279 (citation omitted) (quoting *Gasque*, 246 S.C. at 426, 143 S.E.2d at 812).

"The question of domicile is largely one of intent to be determined under the facts and circumstances of each case." *Gasque*, 246 S.C. at 427, 143 S.E.2d at 812. Generally, "temporary absence from one's domiciliary state *solely* because of government work or employment does not effect a change of domicile within the

---

*S.C. Dep't of Transp.*, 361 S.C. 9, 23, 602 S.E.2d 772, 779-80 (2004) ("Issues and arguments are preserved for appellate review only when they are raised to and ruled on by the [family] court.").

meaning of the divorce laws, in the absence of clear proof of an intent to abandon the old domicile and acquire a new one." *Id.* (emphasis added).

Initially, although the family court's order characterized the question of residence under section 20-3-30 as one of personal jurisdiction, both parties agreed prior to the hearing that the court would determine whether Husband established residency pursuant to section 20-3-30 and whether "jurisdiction for divorce [wa]s proper here as well." Husband does not dispute he was required to satisfy the prerequisites of section 20-3-30 to maintain a divorce action in South Carolina. Therefore, Husband waived any objection to the family court's consideration of the issue.

We find the family court did not err in concluding Husband established Eden as his domicile. Husband and Wife provided conflicting testimony as to Husband's residence. We recognize the family court was in a better position to assess the witnesses' credibility and weigh their testimonies. *See Brown v. Brown*, 379 S.C. 271, 277, 665 S.E.2d 174, 178 (Ct. App. 2008) ("When reviewing decisions of the family court, we are cognizant of the fact the family court had the opportunity to see the witnesses, hear 'the testimony delivered from the stand, and had the benefit of that personal observance of and contact with the parties . . . .'" (quoting *DuBose v. DuBose*, 259 S.C. 418, 423, 192 S.E.2d 329, 331 (1972))). Applying the credibility findings of the family court to the evidence, we find the preponderance of the evidence shows Husband failed to establish he resided in South Carolina for at least one year prior to filing his complaint. We acknowledge Husband introduced several forms of documentation indicating his address as Ansley Court in Greer, South Carolina—principally his 2016 and 2017 tax returns, his driver's license, several bank account and credit card statements, and his pilot's certification. He also testified he provided the Ansley Court address to the Army when he enlisted and never changed it. This evidence, however, is not conclusive of Husband's intent. Husband's parents owned and resided in the Ansley Court home, and no evidence showed Husband owned property in South Carolina. Husband agreed that in late 2011, he and Wife discussed a desire to become established somewhere. Although Husband did not state they discussed finding a permanent home in North Carolina, Wife said they did and that they looked for a home to purchase in Eden. Although they never actually purchased the Center Church Road home, Husband's mother purchased it in 2012 or 2013 and Husband, Wife, and Children moved in after initial renovations on the home were completed around August of 2015. Wife stated they moved in the home with the intent to remain there for several years and then move to another area of North Carolina that was closer to the airport and Children's schools. With the exception of the period in winter and spring of 2015, Wife remained in Eden, North Carolina, whenever

Husband was away on a military assignment, and when Husband was not away for employment or on military orders, he stayed in Eden with Wife. Even by Husband's account, neither he nor Wife lived in South Carolina for the first three-and-a-half years of their marriage. Wife, whose testimony the family court found to be more credible than Husband's, testified they intended for their stay in Greer to be temporary and they only lived there from December 2014 until May of 2015. Furthermore, Wife and Rudisill testified Husband was still living at the Center Church Road home when Wife moved out in September of 2016.[5]

Next, we find the facts of this case are distinguishable from those presented in *Gasque*. In *Gasque v. Gasque*, our supreme court found the husband, a native of South Carolina who resided in Washington, D.C., for fourteen years in connection with his employment with the United States Government, never abandoned his domicile in South Carolina. 246 S.C. at 427, 143 S.E.2d at 812. There, the husband "steadfastly maintained at all times that his legal residence was in the State of South Carolina where he was born, reared, and continuously resided until his acceptance of government employment." *Id.* at 428, 143 S.E.2d at 812. The court found the husband's testimony that he considered himself a resident of South Carolina and never intended to become a resident of any other state was "substantiated by documentary evidence showing repeated and consistent declarations" that he resided in South Carolina. *Id.* Our supreme court concluded the husband's domicile of origin was South Carolina and no evidence showed he ever intended to abandon it while "temporarily serving in the employ of the United States Government in Washington, D.C." *Id.* at 428, 143 S.E.2d at 813. Unlike *Gasque*, here, Husband did not live in North Carolina because of government employment or work. Husband served in the military throughout his marriage, but his military service never required him to reside in North Carolina. The military fully released Husband from active duty in December of 2013, at which point he returned to Eden with Wife and Child 1, and began looking for work. Husband did not specifically seek employment in South Carolina at that time. He eventually obtained employment with Delta in late 2015. Delta permitted him to commute

---

[5] Notwithstanding Husband's testimony that he and Wife separated in May of 2016, Husband's complaint, which stated the couple separated in September of 2016, is conclusive as to the date of separation. *See Postal v. Mann*, 308 S.C. 385, 387, 418 S.E.2d 322, 323 (Ct. App. 1992) ("[P]arties are judicially bound by their pleadings unless withdrawn, altered[,] or stricken by amendment or otherwise. The allegations . . . in a pleading are conclusive as against the pleader and a party cannot subsequently take a position contradictory of, or inconsistent with, his pleadings . . . .").

from the airport of his choosing and his unit assignment with the military was in Pennsylvania. Thus, neither his employment nor his military duties required his presence in North Carolina. Instead, he testified he lived in Eden because that was where his Wife and Children were. Therefore, we find this case is distinguishable from *Gasque* because Husband did not reside in Eden due to his military service or any other government employment.

Finally, we conclude the family court did not err in considering Husband's North Carolina voting record and did not give the records undue weight in reaching its decision. Notwithstanding our de novo standard of review, "an appellant is not relieved of his burden to demonstrate error in the family court's findings of fact." *Lewis*, 392 S.C. at 392, 709 S.E.2d at 655; *see also Bailey v. Bailey*, 293 S.C. 451, 453, 361 S.E.2d 348, 350 (Ct. App. 1987) ("The weight to be given evidence lies within the province of the fact finder, here the family court."). We find the fact Husband was registered to vote in North Carolina is particularly significant. Husband's voting record demonstrated he voted in two primary elections and the general election in Rockingham County, North Carolina in 2014 and in the general election in 2016. The records indicated Husband was registered to vote in North Carolina and did not file his request to cancel his North Carolina registration until May 8, 2017, which was only a few weeks before he filed this divorce action. In our view, regardless of North Carolina voting law, these records were highly probative of Husband's domicile and demonstrated his intent to abandon his parents' home in South Carolina and to reside and remain in Eden, North Carolina. The family court found Husband's testimony that he did not recall voting in North Carolina was not credible given his ability to recall other aspects of his life and employment in detail. Indeed, Husband gave detailed accounts of when and where he traveled on military assignments during the parties' marriage. Thus, the record supports the family court's credibility findings. Moreover, in 2014, Husband encouraged Wife to run in the Rockingham County School Board election and Wife stated he attended all Republican Party political events with her. In addition, Husband served on a committee for the Rockingham County Republican Party and contributed to several North Carolina political campaigns. He admitted he was actively involved with the Republican Party in Eden and participated in political activities there. Husband's actions, including registering to vote and voting several times in North Carolina, demonstrated he did not simply reside in Eden but rather, he intended to establish Eden as his home and become part of its community.

Based on the foregoing, we find the preponderance of the evidence shows Husband abandoned his parents' South Carolina home when he began living with his Wife and Children in North Carolina. By registering to vote, becoming involved in local

politics, residing with his Wife and Children in their home in Eden whenever he was not away for military assignments or his work with Delta, Husband demonstrated an intent to remain in North Carolina indefinitely.  After abandoning South Carolina as his domicile, he did not return there with the intent to remain until September 2016 at the earliest, which was less than one year before he filed this action for divorce.  Accordingly, we affirm the family court's finding that Husband failed to satisfy the residency requirement of section 20-3-30 to maintain an action for divorce in South Carolina.

## II.  Attorney's Fees

Husband argues the family court erred by awarding Wife attorney's fees and costs of $7,241.04.  Husband contends Wife was not entitled to an award of attorney's fees as a matter of law because she was in default.  He next asserts the family court failed to address all relevant factors in deciding whether and how much to award in attorney's fees and the preponderance of the evidence did not support its findings.  He further argues that because Wife failed to file a financial declaration pursuant to Rule 20, SCRFC, the family court could not have considered her financial condition.  We disagree.

"[T]his [c]ourt reviews a family court's award of attorney's fees de novo."  *Stone v. Thompson*, 428 S.C. 79, 92, 833 S.E.2d 266, 272 (2019).

> The court, from time to time after considering the financial resources and marital fault of both parties, may order one party to pay a reasonable amount to the other for attorney fees, expert fees, investigation fees, costs, and suit money incurred in maintaining an action for divorce from the bonds of matrimony, as well as in actions for separate maintenance and support, including sums for services rendered and costs incurred before the commencement of the proceeding and after entry of judgment, pendente lite and permanently.

S.C. Code Ann. § 20-3-130(H) (2014).  In awarding attorney's fees to Wife, the family court noted each party requested attorney's fees pursuant to section 63-3-530(A)(38) of the South Carolina Code (2010) (providing the family court has exclusive jurisdiction "to hear and determine an action whe[n] either party in his or her complaint, answer, counterclaim, or motion for pendente lite relief prays for the allowance of suit money pendente lite and permanently.  In this action the

court shall allow a reasonable sum for the claim if it appears well-founded. Suit money, including attorney's fees, may be assessed for or against a party to an action brought in or subject to the jurisdiction of the family court."). Although we note section 63-3-530(A)(38) provides another vehicle for the family court to award attorney's fees, Husband raised no challenge to the family court's application of this statute on appeal. Rather, both parties referenced only section 20-3-130(H) in their appellate briefs.

When deciding whether to award attorney's fees, the family court considers the following factors: "(1) the party's ability to pay his[or ]her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476-77, 415 S.E.2d 812, 816 (1992). When determining a reasonable attorney's fee, the family court considers "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; (6) customary legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

As an initial matter, although we acknowledge Rule 20, SCRFC, requires the parties to file a financial declaration, and Wife does not dispute she failed to do so, Wife's failure to comply with the rule did not preclude the family court from granting her request for attorney's fees. *See* Rule 20(a), SCRFC ("In any domestic relations action in which the financial condition of a party is relevant or is an issue to be considered by the court, a current financial declaration in the form prescribed by the Supreme Court shall be served and filed by all parties."); Rule 20(d), SCRFC ("Reasonable sanctions may be imposed upon an attorney or a party for willful noncompliance with this rule."). During the hearing, Wife introduced an attorney's fee affidavit and requested an award of attorney's fees. Wife testified she was unemployed and had no income. Husband raised no objection and did not dispute Wife's testimony. Both parties testified they currently lived with their respective parents, and Wife testified Children lived with her. This was sufficient for the family court to consider Wife's financial condition and standard of living compared to Husband's even though she did not file a financial declaration.

Next, we find the family court did not err in awarding Wife attorney's fees. The family court listed the *E.D.M.* factors and noted *Glasscock* set forth the factors for determining reasonable attorney's fees. The court stated it considered all of the factors and found it was appropriate for Husband to pay Wife's attorney's fees and costs of $7,241.04. As to Wife's ability to pay her own attorney's fee, the record

shows she had no source of income, she lived with Children in her parents' home, and there was no evidence she had any other assets. As to beneficial results obtained by the attorney, Wife prevailed on the jurisdiction issue, which we now affirm. Therefore, Wife's counsel obtained beneficial results. As to the parties' respective financial conditions, Wife earned no income, and Husband earned $877 per month from his National Guard drill pay, which was his only source of income at the time. Husband testified he was not "medically cleared to return to fly" for Endeavor at the time of the 2018 hearing because in 2016 he suffered an aggravation to a preexisting back injury, for which he received treatment and physical therapy. Husband stated that when he was able to return to flying, Endeavor guaranteed him a base pay of $2,000 per month. The foregoing shows that as to the parties' respective ability to pay, the parties' respective financial conditions, and the beneficial results obtained, these factors weighed in favor of awarding attorney's fees to Wife. Finally, as to the effect of the attorney's fee on each party's standard of living, we find this factor weighed in Wife's favor. Although both parties were living in their respective parents' homes at the time, Wife earned no income and was also caring for Children; Husband had no formal child support obligation and no testimony showed he had paid for any of Children's expenses since he filed this action for divorce. Therefore, this factor weighed in Wife's favor. Based on the foregoing, the preponderance of the evidence shows Wife was entitled to attorney's fees and we find the family court did not err in awarding attorney's fees to Wife.

Husband further argues that after deciding to award Wife attorney's fees, the family court should have then considered the *Glasscock* factors in determining how much to award in fees and costs. Husband raises this argument for the first time on appeal. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."). Regardless, we find $7,241.04 was a reasonable fee. *See Glasscock*, 304 S.C. at 161, 403 S.E.2d at 315 (providing that courts should consider the following factors in determining a reasonable attorney's fee: "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; (6) customary legal fees for similar services"). In the attorney's fee affidavit, Wife's attorney attested she was an active member of the South Carolina bar, ninety percent of her practice involved family law, the time she and her office spent was necessary to defend Wife in this action, and her fees were "comparable to fees customarily charged in th[e] area for similar legal services." Wife's attorney additionally attested she charged an hourly rate of $200 per hour

for attorney tasks and $100 per hour for paralegal tasks. The billing statement shows Wife's attorney billed for 21.8 hours at the $200 rate and 25.4 hours at the $100 rate. The attorney's fee affidavit therefore established the time necessarily devoted to the case, the professional standing of counsel, and customary legal fees for similar services. *See id.* As to the nature, extent, and difficulty of the case, the only issue litigated between the parties was the narrow question of jurisdiction. Wife incurred a total of $7,241.04 in attorney's fees and Husband incurred $12,000 in attorney's fees. Husband testified his attorney billed $350 per hour for attorney tasks and $85 per hour for paralegal tasks. It is unclear from the record how many hours Husband's attorney devoted to the case; however, given Husband incurred almost $5,000 more in fees for litigating the same issue, we find Wife's attorney's fees were reasonable based upon the nature, extent, and difficulty of the case.

As to the remaining factors of contingency of compensation—*i.e.*, each party's ability to pay their own attorney's fees—and beneficial results obtained, as we stated above, these factors weigh in favor of awarding fees to Wife. *See id.* at 161 n.1, 403 S.E.2d at 315 n.1 ("'[C]ontingency of compensation' and 'beneficial results obtained' are to be considered in determining *whether* an award should be made."); *id.* at 161, 403 S.E.2d at 315 ("[T]he contingency to be considered is whether the party on whose behalf the services were rendered will be able to pay the attorney's fee if an award is not made."); *id.* ("[T]he factor 'beneficial results obtained' merely aids in determining whether an award is appropriate when considering whether the services of a lawyer facilitated a favorable result.").

Finally, we decline to address Husband's argument that Wife was not entitled to attorney's fees because she was in default. Husband raised this argument for the first time on appeal. Therefore, it is unpreserved for our review. *See Wilder Corp.*, 330 S.C. at 76, 497 S.E.2d at 733 ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review.").

Based on the foregoing, we find the family court did not err in awarding attorney's fees to Wife.

**CONCLUSION**

For the foregoing reasons, we affirm the family court's order finding Husband failed to satisfy the residency requirement of section 20-3-30, which was a perquisite to maintaining an action for divorce in South Carolina, and awarding attorney's fees to Wife. Thus, the ruling of the family court is

**AFFIRMED.**

**HEWITT, J., and HUFF, A.J., concur.**